*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRYAN ZACK and ANDREA ZACK,

      Plaintiffs-Appellants-Cross-
      Appellees,

v

THOMAS C. CLOCK III and CLOCK FUNERAL
HOME OF WHITE LAKE, INC.,

      Defendants-Appellees-Cross-
      Appellees,

and

WESTFIELD INSURANCE COMPANY,

      Defendant-Appellee-Cross-
      Appellant.

UNPUBLISHED
June 11, 2019

No. 343732
Muskegon Circuit Court
LC No. 16-005879-NO

Before: BECKERING, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Plaintiffs appeal as of right the trial court's order granting summary disposition in favor of defendant, Westfield Insurance Company (Westfield), based on its finding that plaintiffs' injuries did not occur during the insurance policy period. Westfield cross-appeals from the same order, challenging the trial court's determination that questions of fact existed concerning whether the "criminal acts" exclusion in the insurance policy applied in this matter. We affirm.

The facts in this case are uncontested. Plaintiffs' infant son passed away in February of 2015. Plaintiffs arranged for funeral and burial services with defendants, Clock Funeral Home of White Lake ("the funeral home") and Thomas C. Clock III (Clock). The visitation and funeral services were conducted on February 16 and 17, 2015, but burial was delayed due to a required autopsy. Plaintiffs requested that their son be cremated and that his ashes be buried in an urn they provided to Clock. Clock conducted a burial service interring the urn on April 18, 2015.

At the time of the funeral and burial, the funeral home and Clock were insured through a business liability policy issued by defendant Westfield. However, Westfield cancelled the policy, effective December 19, 2015, due to nonpayment.

At some point in January of 2016, an employee of Clock and the funeral home discovered a box at the funeral home labeled as the ashes of plaintiffs' son. The employee delivered the box to the plaintiffs and, during an investigation into Clock's activities, their son's grave was exhumed. The urn in the grave was empty.[1]

Plaintiffs submitted a claim for damages to Westfield and Westfield denied the claim. Plaintiffs thus initiated the instant action against the funeral home and Clock on various theories of negligence, and against Westfield seeking a declaratory action that their injuries were covered by the policy Westfield issued to the funeral home and Clock. Relevant to this appeal, Westfield moved for summary disposition pursuant to MCR 2.116(C)(10), contending that plaintiffs' injury did not occur while the insurance policy was in effect and that it thus had no duty to defend or indemnify Clock and the funeral home against plaintiffs' claims. Westfield further argued that a "criminal acts" exclusion in the policy precluded coverage. The trial court granted the motion with respect to Westfield's first argument, but denied summary disposition with respect to Westfield's second argument.[2] This appeal and cross-appeal followed.

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Anzaldua v Neogen Corp*, 292 Mich App 626, 629; 808 NW2d 804 (2011). In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a court considers the pleadings, affidavits, depositions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion. *Abbott v John E Green Co*; 233 Mich App 194, 197; 592 NW2d 96 (1998). The nonmoving party may also not rest on the allegations in the pleadings, but must set forth, through documentary evidence, specific facts demonstrating a genuine issue for trial. *Anzaldua*, 292 Mich App at 30. If the documentary evidence shows that there is no genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *Abbott*, 233 Mich App at 197.

This Court also reviews de novo a court's construction and interpretation of an insurance contract. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353; 596 NW2d 190 (1999). Insurance policies are subject to the same contract construction principles that apply to any other type of contract. *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 714; 706 NW2d 426 (2005) (citation and quotation marks omitted). We look at the plain language of the policy and enforce it in accordance with its unambiguous terms. *Henderson*, 460 Mich at

---

[1] Clock was criminally charged in relation to this, as well as another incident, and ultimately pleaded no contest to "gross fraud or cheat at common law by deceiving a family into believing that they were burying the remains of their infant son but in fact the urn was empty contrary to law."

[2] Plaintiffs entered into a consent judgment with the funeral home and Clock and that judgment has not been appealed.

353-354. If the policy is ambiguous—that is, if its provisions are capable of conflicting interpretations—its meaning is a question of fact to be decided by the fact-finder. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467, 469; 663 NW2d 447 (2003). A court should not, however, create ambiguity in an insurance policy where the terms of the contract are clear and precise. *Auto–Owners Ins Co v Churchman*, 440 Mich 560, 567; 489 NW2d 431 (1992).

Westfield issued a policy of insurance to the funeral home for the period of October 15, 2014, through October 15, 2015. Westfield concedes that the policy is applicable to Clock, pursuant to the language in the policy. The policy coverages and exclusions were set forth in a BusinessOwners[3] Coverage Form which provides, in relevant part:

**Section II-Liability**

    **A.    Coverages**

        **1.    Business Liability**

            **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages [f]or "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result . . . .

                    **\*\*\***

            **b.**    This insurance applies:

            **(1)**    To "bodily injury" or "property damage" only if:

            **(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

---

[3] The words "business" and "owner" appear together as one word in the policy.

**(b)** The "bodily injury" or "property damage" occurs during the policy period . . . .

The policy also contains a Funeral Directors Professional Liability endorsement, which modified the insurance provided under the Business Owners Coverage form. Specifically, the endorsement provides:

**Section II Liability** is amended as follows:

A. For the insurance provided by this endorsement, all provisions under Paragraph **A.1. Business Liability** also apply to other injury.

B. Paragraph **A. Coverages** also applies to "bodily injury", "property damage", "personal and advertising injury" or other injury arising out of the rendering of or failure to render professional services in connection with the insured's business as a funeral director.

C. With respect to the coverage provided by this endorsement, Paragraph **B. Exclusions** is amended as follows:

\*\*\*

3.      The following Exclusion is added:

This insurance does not apply to:

"Bodily injury", "property damage", "personal and advertising injury" or other injury arising out of a criminal act including but not limited to fraud committed by the insured or any person for whom the insured is legally responsible.

\*\*\*

F. For the coverage provided by this endorsement, the definition of "occurrence" in Paragraph **F. Liability and Medical Expenses Definitions**, is amended to include any act or omission arising out of the rendering or failure to render professional services as a funeral director.

Thus, the endorsement extends business liability coverage to "other injuries", and extends the definition of "occurrence" to acts and omissions arising out of services rendered or the failure to render services as a funeral director. The endorsement also, however, adds an exclusion of coverage for any injury arising out of a criminal act committed by the insured or anyone for whom the insured is legally liable.

On appeal, plaintiffs contend that the trial court erred in granting Westfield summary disposition because the insurance policy is applicable to Clock's errors and omissions and because plaintiffs' injuries occurred while the policy was still in effect. Westfield, on the other

hand, insists that plaintiffs' injuries occurred after the policy was cancelled and that, even if the injuries did occur within the policy effective dates, the "criminal acts" exclusion in the policy nonetheless precludes coverage. To determine whether plaintiffs are entitled to insurance benefits we employ a two-part analysis, first determining if the policy provides coverage to plaintiffs, and if it does, "we then ascertain whether that coverage is negated by an exclusion," *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 172; 534 NW2d 502 (1995); here, the criminal acts exclusion.

The BusinessOwner policy issued to the funeral home and Clock unambiguously and specifically states that it applies to bodily injury or property damage *only* if it is caused by an occurrence that took place in the coverage territory *and* the bodily injury or property damage "occurs during the policy period . . . ." There are thus two prongs necessary to trigger coverage. There is no dispute that an "occurrence", as defined in the endorsement to include "any act or omission arising out of the rendering or failure to render professional services as a funeral director" took place in 2015 when the insurance policy was in effect. There is also no dispute that plaintiffs suffered an injury as a result of that occurrence. While the endorsement expands coverage to "other injury" and "other injury arising out of the rendering of or failure to render professional services in connection with the insured's business as a funeral director", the endorsement in no way alters the requirement that the injury or damage occur during the policy period. Thus, unless plaintiffs establish that their injuries occurred during the policy period, Westfield's duty to defend and indemnify the funeral home and Clock is not triggered. We find that they did not.

Plaintiffs asserted in their complaint that Clock was arrested on January 9, 2016, and that while he was in jail, one of his employees found the box purportedly containing their son's ashes. They alleged that on March 18, 2016, their son's grave was exhumed and it was confirmed that the urn that was intended to hold his ashes was empty. Plaintiff's asserted that as a result of Clock's negligence, they suffered severe mental and emotional pain and suffering, physical pain and suffering, denial of social pleasure, embarrassment, humiliation, mortification, and medical expenses. Because plaintiffs did not learn that their son's ashes were not, in fact, buried until after the policy coverage had ended, they did not suffer their emotional, mental and physical injuries resulting from that negligent act until after the policy had terminated.

Plaintiffs claim that the injury they sustained was interference with their right to control the final disposition of their son's remains, and that this injury was incurred the moment Clock buried an empty urn. However, the interference was simply the wrongful action Clock engaged in that *resulted in* injuries to plaintiffs. Plaintiffs cite to *Hannay v Dept of Transp*, 497 Mich 45, 64; 860 NW2d 67 (2014) in support of their position. In *Hannay*, the plaintiff was physically injured in an automobile accident. The Court interpreted a provision in the No-Fault Act, noting that "injury" and "damages" are distinct and that damages flow from an injury. *Id*. The Court held that:

> In light of . . . this Court's delineation of the difference between "injury" and "damages" . . . "liable for bodily injury" in the present case means legally responsible *for damages flowing from* a physical or corporeal injury to the body. Stated differently, "bodily injury" is simply the category of harm (i.e., the type of injury) for which the government waives immunity under MCL 691.1405 and,

thus, for which damages that naturally flow are compensable. Therefore, the legal responsibility that arises from "bodily injury" is responsibility for *tort damages* that flow from that injury. *Id*. at 64 (emphasis in original).

Just as the auto accident itself in *Hannay* was not the injury suffered by the plaintiffs in that case but instead the event causing injuries, so too, the act of Clock interfering with their right to control the final disposition of their son's ashes is not the injury here. Rather, that act *caused* plaintiff's injuries (severe mental and emotional pain and suffering, physical pain and suffering, humiliation, embarrassment, medical expenses, etc.). And they could and did seek to hold defendants legally responsible for the damages (i.e. money claimed by, or ordered to be paid to a person as compensation for loss or injury, See, Black's Law Dictionary, (7th ed.)) flowing therefrom.

Plaintiffs additionally assert that the policy at issue was an "errors and omissions" policy and attempt to categorize the policy as an "occurrence policy" (one of the two types of identified errors and omissions policies). According to plaintiffs, because the policy was an errors and omissions occurrence policy, their claims are covered. This categorization, however, ignores the plain language of the insurance policy. Regardless of what the policy is called, we *must*, according to longstanding law, interpret and enforce an unambiguous contract "as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Tr*, 480 Mich 19, 24; 745 NW2d 754 (2008). We find *Gelman Sciences, Inc v Fidelity Cas Co*, 456 Mich 305, 312, 329; 572 NW2d 617 (1998), amended sub nom. *Arco Indus Corp v Am Motorists Ins Co*, 456 Mich 1230; 576 NW2d 168 (1998), overruled on other grounds by *Wilkie v Auto-Owners Ins Co*, 469 Mich 41; 664 NW2d 776 (2003) instructional on that issue.

In that case, our Supreme Court noted that courts have had difficulty determining when insurance coverage is triggered in cases involving gradual, continuous, or delayed property damage from pollution because the actual damage is not discovered until years after the pollution began. Courts had discussed four possible theories for determining when coverage is triggered under standard comprehensive general liability policies: the exposure theory, the injury in fact theory, the manifestation theory, and the continuous trigger theory. *Id*. at 313. The *Gelman* Court determined that references to trigger theories can be deceiving because, "[u]ltimately, it is the policy language as applied to the specific facts in a given case that determines coverage" and the issue "is fundamentally a question of insurance contract interpretation." *Id*. at 316, 317.

The insurance policy before the *Gelman* Court provided coverage for bodily injury or property damage "to which this [i]nsurance applies, caused by an occurrence. . ." The policy defined "occurrence" as "an accident, including injurious exposure to conditions, which results *during the policy period,* in bodily injury or property damage . . ." *Id*. at 318-319 (emphasis in original). Our Supreme Court held that the policy language concerning when coverage was triggered was unambiguous and, "according to the policies' explicit terms, actual injury must occur during the time the policy is in effect in order to be indemnifiable, i.e., the policies dictate an injury-in-fact approach." *Id*. at 319-320. The *Gelman* Court acknowledged that determining the precise timing of actual property damage is sometime difficult and while it "appreciate[s] the difficulty of proof in this regard, this difficulty cannot justify redrafting unambiguous policy terms in the guise of judicial interpretation." *Id*. at 323.

Again, the policy at issue clearly and unambiguously provides coverage *only* if it is caused by an occurrence that took place in the coverage territory *and* the bodily injury or property damage "occurs during the policy period . . ." Plaintiffs' injuries did not occur during the policy period. The trial court thus properly granted summary disposition in favor of Westfield. Given the above, we need not consider the argument presented by Westfield on cross-appeal.

Affirmed.


/s/ Jane M. Beckering
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens